NO. 07-10-0367-CR

NO. 07-10-0368-CR

                                                                              

                                                   IN THE COURT OF
APPEALS

 

                                       FOR THE SEVENTH DISTRICT OF
TEXAS

 

                                                                 AT
AMARILLO

 

                                                                      PANEL
B

 

                                                            OCTOBER
20, 2010

                                            ______________________________

 

                                                                CARLOS
VIGIL,

 

                                                                                                            Appellant

 

                                                                             v.

 

                                                        THE STATE OF
TEXAS, 

 

                                                                                                            Appellee

 

________________________________

 

                        FROM THE 251st DISTRICT COURT OF POTTER
COUNTY;

 

                       NOS. 57,173-C, 57,174-C; HON. ANA ESTEVEZ,
PRESIDING

                                           _______________________________

                                                                              

                                               ON ABATEMENT AND
REMAND

                                           _______________________________

 

Before QUINN, C.J., and CAMPBELL
and HANCOCK, JJ.

Appellant appeals from his convictions for indecency with a child.  Neither the clerk’s record nor the reporter’s
records have been filed.  Counsel for
appellant has filed a motion to withdraw, stating that he has not been employed
to represent appellant in these appeals. 
Counsel further states that appellant has filed an affidavit of
indigence.

Accordingly, we
abate these appeals and remand the causes to the 251st District Court of Potter
County (trial court) for further proceedings. 
Upon remand, the trial court shall determine, by reasonable evidentiary
procedure it selects, the following:

1.  whether appellant
desires to prosecute the appeals; 

         2. 
whether appellant is indigent; and, if so,

3.  whether the appellant is entitled to a free appellate record
in each case and the appointment of an attorney due to his indigency. 

 

The trial court
is also directed to enter such orders necessary to address the aforementioned
questions.  So too shall it include its
findings on those matters (including the name, address, and phone number of any
attorney it may appoint to represent appellant in these appeals) in a
supplemental record in each case and cause those records to be filed with this
court by November 19, 2010.  Should
further time be needed to perform these tasks, then same must be requested
before November 19, 2010.  In the
meantime, all other appellate deadlines and counsel’s motion to withdraw are
stayed until further order of this court.

It is so
ordered.

Per Curiam

Do not publish.






s Rule of Evidence 407,
which states that subsequent remedial measures are inadmissible to prove negligence or
culpable conduct. Exxon Corp. v. Roberts, 724 S.W.2d 863, 869 (Tex. App.--Texarkana
1986, writ ref'd n.r.e.); City of Amarillo v. Reid, 510 S.W.2d 624, 630 (Tex. Civ. App.--Amarillo 1974, writ ref'd n.r.e.). However, it does not demand exclusion if the evidence is
offered for another purpose, such as to prove, among other things, control. Tex. R. Evid.
407(a); Roosth & Genecov Prod. Co. v. White, 262 S.W.2d 99, 104-105 (Tex. 1953)
(discussing the principle and its exceptions).

 For example, if the existence of one's duty to act depended upon his right to control
a matter and dispute existed as to which of two parties had that right, then evidence of
one's party's amelioration of a condition (after an injury occurred) is admissible as
evidence illustrating that the party ameliorating the condition had control over the matter. 
Spurr v. LaSalle Constr. Co., 385 F.2d 322, 327-28 (7th Cir. 1967) (applying the
comparable federal rule); 2 J. Weinstein, M. Berger, & J. McLaughlin, Weinstein's
Evidence ¶ 407[04] (1996).

 2. Application of Standard

 Here, LLC denied that it had the right and obligation to control safety measures in
general and the fall protection utilized by KK's employees in particular. Yet, that it installed
the steel cable and provided a scaffold for use by those employees is evidence akin to that
contemplated in Spurr and Weinsteins's Evidence. In other words, it is probative on the
question of who exercised control over safety measures utilized by those working above
ground and outside the building, i.e., LLC or each subcontractor. (7) Thus, it was admissible
under rule 407(a) and the trial court did not abuse its discretion in admitting it.

 Nevertheless, LLC posits that before the evidence could be admitted, Jimmy's kin
had to illustrate that KK was required by LLC to utilize the devices LLC provided. To so
suggest is to argue that one must prove that another controlled a certain activity before
evidence illustrating that he controlled it can be admitted. We reject the suggestion. Proof
that LLC controlled KK (via proof that KK was obligated to use the device) is not a
condition precedent to the admissibility of evidence illustrating that LLC controlled KK. 
And, assuming by some stretch of the imagination that it were, such proof exists at bar;
LLC's president testified that it could remove from the site those who did not abide by its
safety directives. So, if LLC told KK to use the steel cable and scaffold, KK had to or risk
being removed.

 We also reject LLC's contention that the limiting instruction provided to the jury was
a comment on the weight of the evidence. (8) This is so because the particular ground is
urged here for the first time contrary to Rule 33.1(a) of the Texas Rules of Appellate
Procedure. Furthermore, the instruction does not reasonably tend to suggest anything
about the mental impressions or belief of the court nor minimize or place emphasis on any
of the evidence. First Nat'l Bank of Amarillo v. Jarnigan, 794 S.W.2d 54, 62 (Tex. App.--Amarillo 1990, writ denied).

 Evidence Supporting Compensatory Damages Awarded to Jimmy


 Next, the trial court submitted a question to the jury asking it to determine what
monies would "fairly and reasonably compensate[] Jimmy Harrison for pain and mental
anguish." It answered $500,000. LLC contends that this answer lacks factually sufficient
evidentiary support. This is allegedly so because Jimmy's kin "failed to establish through
any testimony or evidence whatsoever that Jimmy . . . consciously experienced any pain,
suffering or mental anguish." In other words, LLC disputes the award because it believes
that the evidence fails to evince that Jimmy was conscious of his ten story fall and its
ramifications. We agree in part.


 1. Standard of Review

 We discussed above the standard of review applicable to claims of factual
insufficiency. The parties are referred to it.

 Damages for pain and mental anguish are recoverable in suits for personal injury. 
However, they must be sought for recompense for pain and anguish experienced while
conscious. Southern Pacific Transp. Co. v. Luna, 730 S.W.2d 36, 38 (Tex. App.--Corpus
Christi 1987, no writ); Burrous v. Knotts, 482 S.W.2d 358, 363 (Tex. Civ. App.--Tyler 1972,
no writ). Because the amount to award is not calculable by any mathematical formula, the
fact finder enjoys discretion in determining the sum. Saenz v. Fidelity & Guar. Ins.
Underwriters, 925 S.W.2d 607, 614 (Tex. 1996). Yet, its discretion is not unbridled. Id.;
Burlington Coat Factory Warehouse of El Paso, Inc. v. Flores, 951 S.W.2d 542, 548 (Tex.
App.--El Paso 1997, no writ). A jury is not free to simply select any amount which it may
care to. Saenz v. Fidelity Guar. Ins. Underwriters, 925 S.W.2d at 614. Rather, the sum
derived must be that which fairly and reasonably compensates the injured for undergoing
the experience. Id.

 In assessing the validity of the jury's finding, our task is twofold. Not only must we
peruse the record to determine whether evidence illustrates that the injured experienced
compensable pain, suffering, and anguish but also that the amount awarded for
experiencing same is reasonable. Id.; Burlington Coat Factory Warehouse of El Paso, Inc.
v. Flores, 951 S.W.2d at 548. Whether the complainant suffered a severe physical injury
is one indicia which we can consider for pain and anguish presumably accompanying such
an injury. Bedgood v. Madalin, 589 S.W.2d 797, 806 (Tex. Civ. App.--Corpus Christi
1979), affirmed in part and reversed and remanded in part on other grounds, 600 S.W.2d
773 (Tex. 1980).

 In addition to the nature of the injury, another factor concerns the consciousness
of the individual and the duration of the injury's effects. See Gulf States Utilities Co. v.
Reed, 659 S.W.2d 849, 855 (Tex. App.--Houston [14th Dist.] 1983, writ ref'd n.r.e.)
(concluding that five seconds of pain inflicted via electrocution supported an award of
$10,000); Burrous v. Knotts, supra (reducing the award by $30,000 to $10,000 because
the jury did not distinguish between periods of consciousness and unconsciousness). 
Contemplated within this is consciousness not only of pain and suffering but also of
approaching death. Hurst Aviation v. Junnell, 642 S.W.2d 856, 859 (Tex. App.--Fort Worth
1982, no writ). So too are the degree (i.e. severity) and duration of the pain and distress,
Parkway Co. v. Woodruff, 901 S.W.2d 434, 444 (Tex. 1995) (noting that the court must
distinguish between shades and degrees in evaluating claims of mental anguish), the
extent to which the daily routine of the injured is disrupted, id., and the similarity of the
award with those in other cases of import. (9) Landreth v. Reed, 570 S.W.2d 486, 490 (Tex.
Civ. App.--Texarkana 1978, no writ).

 2. Application of Standard

 The record reveals that Jimmy fell from the tenth floor, a height approximating 120
to 140 feet from the ground. His colleague saw him fall from the window. Another witness,
Ed Smith, heard a yell, looked up, noticed Jimmy within feet of the ground, and saw him
land within 20 to 30 feet of Smith's location. Smith concluded that the person who he
heard yelling was Jimmy, attempted to call a supervisor, and proceeded to the spot where
Jimmy lay. Before arriving, Smith was told to stop because Jimmy was dead.

 We are cited to no evidence suggesting that Jimmy was either conscious or even
alive at anytime after striking the ground. Nor does our own investigation of the record
uncover any. Given this, we have no basis upon which to hypothesize, much less
conclude, that Jimmy was either conscious or alive immediately after reaching the ground. 
Rather, the distance of his fall, the blood spatter, and the manner of his landing would
indicate that he was neither alive nor conscious.

 In effect, all that can be inferred from this record is that Jimmy was conscious while
falling and perceived his fall, as suggested by his yelling. Yet, through the application of
physics (a body of mathematics of which we take judicial notice), his perception of the fall
and its potential consequence could have lasted no more than 2.7 to 4 seconds. And,
given Jimmy's death, whether he will experience disruption in his daily routine matters not. 

 Thus, the question devolves into one more within the realm of philosophy than
jurisprudence and it concerns the amount of money which would reasonably compensate
someone who knew that he would be dead within seconds. The youth in Gulf States
Utilities suffered approximately five seconds of electrocution before dying. The jury valued
those few seconds and the concomitant pain and anguish at $10,000, an amount the
appellate court found acceptable. Gulf States Utilities Co. v. Reed, 659 S.W.2d at 855. 
In Hurst Aviation, wherein the decedent was aware of his descent from the sky for
apparently less than a minute, the value was set at $20,000; this sum the appellate court
also found acceptable. Hurst Aviation v. Junell, 642 S.W.2d at 859. In Green v. Hale, 590
S.W.2d 231 (Tex. Civ. App.--Tyler 1979, no writ), wherein consciousness of the dire
circumstances was brief, the court approved an award of $5,000. Id. at 237-38. In
Guzman v. Guajardo, 761 S.W.2d 506 (Tex. App.--Corpus Christi 1988, writ denied), two
of three justices thought an award of $600,000 for at least fifteen minutes of pain and
suffering was reasonable. Id. at 512.

 Conversely, $65,000 was considered an excessive award for one who was
conscious while drowning in Landreth. Thus, the court reduced the sum to $35,000. 
Landreth v. Reed, 570 S.W.2d at 492. Similarly, an award of $40,000 for living ten
minutes after the onset of a fire was deemed excessive by $30,000 in Burrous. So,
remittitur was ordered.

 After considering the sparse evidence of record, the few seconds involved, and the
verdicts rendered in other cases, we conclude that some evidence supports the award of
damages for pain, suffering, and mental anguish. However, the 2.7 to 4 seconds of mental
anguish experienced is factually insufficient to support an award of $500,000. Remittitur
is appropriate.

Exemplary Damages and Gross Negligence


 Next, LLC posits that the exemplary damages awarded to Jimmy's kin lacked legally
and factually sufficient evidentiary support. This is so because they allegedly failed to
prove that LLC acted grossly negligent. (10) We disagree.


 1. Standard of Review

 We incorporate the standard of review applicable to claims of legal and factual
insufficiency expressed supra. For the finding of gross negligence to be supportable, the
evidence must satisfy two prongs. First, when viewed objectively from the actor's
standpoint, the act or omission must involve an extreme degree of risk, considering the
probability and magnitude of the potential harm to others. Mobil Oil Corp. v. Ellender, 968
S.W.2d 917, 921 (Tex. 1998). That is, the defendant's acts or omissions must create a
grave risk of substantial injury. Universal Servs. Co. v. Ung, 904 S.W.2d 638, 641 (Tex.
1995). Furthermore, this risk of injury created by the defendant's conduct must be more
than remote. In Transportation Insurance Co. v. Moriel, 879 S.W.2d 10 (Tex. 1994), the
court noted that the misconduct must "greatly increase[] the likelihood" of serious injury. 
Id. at 22 n.14. In other words, the chance of such harm must be likely, as opposed to
remote. Id. at 22; see Mobil Oil Corp. v. Ellender, 968 S.W.2d at 921 (construing the
element as requiring proof that the defendant's conduct produced a "likelihood of serious
injury"); Universal Serv. Co. v. Ung, 904 S.W.2d at 641 (stating the same).

 Under the second prong, the actor must actually be aware of the risk he is creating
and nevertheless proceed with his conduct in conscious indifference to the rights, safety,
or welfare of others. Mobil Oil Corp. v. Ellender, 968 S.W.2d at 921. Stated differently, the
second element obligates the complainant to prove that the defendant knew of the grave
peril accompanying his activity but did not care about it. Id.

 As can be seen, more than mere negligence is necessary. Again, the actor's
behavior must reasonably form a likelihood of serious injury and the likelihood must be
known to and, consciously ignored by, the actor. Finally, one may rely upon circumstantial
evidence to prove each of these elements. Mobil Oil Corp. v. Ellender, 968 S.W.2d at 921.

 2. Application of Standard

 a. Legal Sufficiency

 i. First Prong -- Conduct Creating Extreme Risk

 Jimmy's kin is correct in saying that "it is important to first define the risk" involved. 
As required by Mobil and Ung, the pertinent risk here is that created or caused by the
action or inaction of LLC. Thus, it is not enough to suggest, as do Jimmy's kin, that the
risk involved here was that "workers would fall ten stories to their deaths," for that
proposition neither considers the duties of LLC nor its acts or omissions in relation to those
duties. That is, the risk of falling to one's death is but part of the equation. The remainder
addresses whether LLC's conduct was such as to make the chance of falling to one's
death likely. The conduct in question pertains to LLC's failure to provide adequate fall
protection contrary to its duty to do so. Thus, to satisfy the first prong, more than a scintilla
of evidence must exist illustrating that a reasonable person viewing the circumstances from
the standpoint of LLC would conclude that the conduct of LLC in failing to provide
adequate fall protection created an extreme and likely risk of a worker falling to his death. 
We now turn to the record to determine if such evidence exists.

 To complete the construction project, some of the work had to be performed outside
the building by people hanging off the 9th and 10th stories. Working against those
individuals would be Newton's law of gravity. Furthermore, it was generally understood
that gravity coupled with the distance from which the workers would hang made death the
likely result of any fall. That falling was not a foreign concept in the construction industry
is exemplified by the testimony of LLC's president, who conceded that falls were one of the
"top" causes of serious injury or death at construction sites. Another witness called it the
"number one killer of construction workers." So too did the president, who had been
involved in the construction industry for many years, acknowledge other matters of import. 
The first concerned his belief that there was no greater hazard to workmen at the site and
the second that the failure to use "proper fall protection techniques . . . could expose . . .
subcontractor employees to a fall that would result in certain death." Other witnesses,
including representatives of LLC, concurred in this assessment.

 Though disputed, some expert evidence further illustrates that the devices actually
utilized by Jimmy (a lanyard and safety belt) were themselves hazardous or deficient. Had
he hung from them, he could have have broken his back or suffocated. That this
equipment was being used by Jimmy, without an independent lifeline, was known to LLC,
for its supervisor saw him utilizing it.

 Other evidence depicts LLC opting to allow each subcontractor to select and
implement its own safety measures. It believed that responsibility for the safety of an
independent contractor's employees lay with the independent contractor, not LLC. So,
safety issues were left to the contractor, even though LLC employed an individual with
authority to monitor, regulate, and affect the safety practices of those subcontractors.

 In sum, we have before us evidence that LLC remained silent (while having a duty
to act) when Jimmy was performing a job 1) at such an altitude that a fall would result in
death and 2) with equipment inadequate to protect him from death should he fall. LLC did
this while knowing that falls were not uncommon occurrences but rather major causes of
death at construction sites. From this evidence, a reasonable person could conclude that
LLC's failure to provide adequate fall protection created an extreme and likely risk of
death. Thus, legally sufficient evidence supports the first prong. 

 ii. Second Prong -- Subjective Awareness and Conscious
Indifference


 As previously mentioned, to satisfy the second prong of Ellender, some evidence
must exist illustrating that the defendant knew of the extreme risk accompanying its activity
but did not care. We find that such evidence appears of record in several ways, the first
of which involves the testimony of LLC's president. Again, he stated that falling was a
prime cause of injury, a major hazard to those working at the site, and likely to result in
death given the height at which KK's employees would be working. Furthermore, the
individual hired by LLC to supervise the construction and the safety measures being
utilized saw Jimmy working without an independent lifeline some 120 feet above the
ground. This is of import because the LLC safety program required the use of "[l]ifelines,
safety belts, and lanyards . . . where there is a danger of falling." (emphasis added). 
Having seen Jimmy without an independent lifeline and despite LLC's own regulations,
LLC's vice-principal said and did nothing to curtail the activity.

 That this disregard comported with what could be perceived as a general policy of
disregarding safety risks posed to subcontractors finds support in other evidence. For
instance, the very same vice-principal alluded to above eschewed meeting with
subcontractors to discuss safety measures. Both he and LLC's president simply believed
that such matters were not LLC's concern, even though it 1) represented to Methodist that
it would have plenary responsibility for the safety of everyone working at the project and
2) it required, via its "Safety Program," that all employees (which included the vice-principal) to insist that fellow employees follow safety rules and practices. From this, one
could reasonably infer that LLC consciously opted to forego performing those safety duties
(vis safety) which it not only told Methodist it would perform, but also told the jurors at
times that it had the power to perform.

 Moreover, evidence disclosed that LLC had other equipment which could have
made the performance of Jimmy's duties safer. One such device was a swinging stage
scaffold. Evidence, though conflicting, indicated that while LLC employees were free to
use it, those employed by subcontractors were not. Instead, the latter were given the
option to rent it or acquire their own.

 From the foregoing, a rational jury could conclude that LLC was not only aware of
the grave risk in question but also that it opted to consciously disregard it. Thus, the
finding that LLC was grossly negligent enjoys legally sufficient evidentiary support. Our
conclusion is not altered by LLC's contention that it exercised some care by its institution
of a safety program and retention of purported safety consultants. Reference to such
evidence is of little value when the question is one of legal sufficiency. This is so because
the standard of review obligates us to consider evidence supporting the verdict, not
contradicting it. See Mobil Oil Corp. v. Ellender, 968 S.W.2d at 924 (holding that Mobil's
reference to some evidence of care did not affect the court's legal sufficiency analysis).

 b. Factual Sufficiency

 That there existed evidence contradicting the jury's finding of gross negligence is
beyond dispute. As alluded to in the previous paragraph, LLC presented some testimony
that it exercised care. Other testimony indicated that it believed the equipment utilized by
Jimmy was safe and complied with standards implemented by the Occupational Safety and
Health Administration. While this court may not have reached the same conclusion as that
of the jury had it been the fact finder, we are unable to say that the verdict was factually
insupportable. In other words, the evidence supporting the verdict was not insubstantial
or weak. Nor was that contradicting the verdict so overwhelming as to render the verdict
clearly wrong or manifestly unjust.

Summary Judgment in Favor of KK


 In its last point of error, LLC argues that the trial court erred in granting summary
judgment to KK and, thereby, denying it contribution and indemnity against KK. We
disagree.

 1. Standard of Review

 The standard of review for assessing the validity of a summary judgment is well
known. We refer the litigants to Sysco Food Servs., Inc. v. Trapnell, 890 S.W.2d 796 (Tex.
1994), for discussion of same.

 2. Application of Standard

 Upon suit by Jimmy's kin, LLC initiated a cross-claim against KK for contribution and
indemnity. It did so based upon paragraph 11.7 of the subcontract. (11) KK moved for
summary judgment, arguing that section 408.001 of the Texas Labor Code insulated it from
liability and that paragraph 11.7 did not satisfy the express negligence rule. The trial court
granted the motion, but did not state the particular grounds upon which it did. Thus, our
task is to determine whether either ground supported the court's action. Miller v.
Galveston/Houston Diocese, 911 S.W.2d 897, 899 (Tex. App.--Amarillo 1995, no writ).


 a. Section 408.001

 Section 408.001 of the Labor Code states that the recovery of workers'
compensation benefits is the exclusive remedy available to an employee against his
employer (assuming that the employer subscribes to the Workers Compensation Act). 
Tex. Lab. Code Ann. § 408.001(a) (Vernon 1996). Since KK apparently subscribed to the
Act, both Jimmy and his kin were barred from suing it for compensatory damages. This
bar also had the incidental effect of shielding KK from suit by a third-party under common
law concepts of indemnity and contribution. See Varela v. American Petrofina Co. of
Texas, Inc., 658 S.W.2d 561, 561-63 (Tex. 1983) (denying a third-party defendant the
opportunity to obtain contribution and indemnity from the employer). Yet, the scope of the
shield is limited. It does not apply to situations where an employer expressly agreed, in
writing, to indemnify the third-party before the mishap giving rise to the need for indemnity
occurred. Act of May 5, 1983, 68th Leg., R.S., ch. 131, § 1, 1983 Tex. Gen. Laws 613, 614
(amended 1989, 1993, current version at Tex. Lab. Code Ann. § 417.004 (Vernon 1996)); (12)
Enserch Corp. v. Parker, 794 S.W.2d 2, 7 (Tex. 1990); Faulk Mgt. Servs. v. Lufkin Indus.,
Inc., 905 S.W.2d 476, 478-79 (Tex. App.--Beaumont 1995, writ denied); Verson Allsteel
Press Co. v. Carrier Corp., 718 S.W.2d 300, 302-303 (Tex. App.--Tyler 1985, writ ref'd
n.r.e.). The agreement at bar was such an agreement.

 Via paragraph 11.7 of the subcontract, KK expressly committed to "indemnify . . .
and defend" LLC " from and against all claims, damages, losses, and expenses . . . arising
out of or resulting from" the performance of KK's work. The claims subject to
indemnification included those "attributable to bodily injury, sickness, disease, or death"
and "caused in whole or in part" by the negligence of KK, "regardless of whether . . . [LLC]
caused [it] in part."

 That 11.7 was executed before Jimmy fell to his death is undisputed. Equally clear
is that it expressly mentions indemnification, the conditions which trigger the duty to
indemnify, the party obligated to provide indemnity, and the party to be indemnified. 
Indeed, the clause at bar is not unlike those in Enserch, Faulk, and Verson which were
found to satisfy the statutory indicia. Each illustrated the requisite intent to indemnify in
specific terms. That none expressly mentioned that the duty to indemnify encompassed
damages arising from injury suffered by an employee of the indemnitor matters not, for
same is not necessary. Enserch Corp. v. Parker, 794 S.W.2d at 7-8; Verson Allsteel Press
Co. v. Carrier Corp., 718 S.W.2d at 302-303. So, as in Enserch, Verson, and Faulk, "the
indemnity language in the contract between" LLC and KK "is sufficient to show that . . .
[KK] expressly assumed liability for injuries to its own employees." Enserch Corp. v.
Parker, 794 S.W.2d at 8. Yet, this does not end our inquiry.

 b. Indemnity and/or Contribution Under Paragraph 11.7

 We next assess the scope of paragraph 11.7. In doing so, we immediately note that
nothing therein expressly mentions contribution or KK's duty to contribute to the payment
of any award. Rather, the clause specifically obligates KK to "indemnify, hold harmless,
and defend" LLC. This is of moment because contribution and indemnity are distinct
concepts. The former connotes, as stated by the Texas Supreme Court long ago, a
proration of liability among joint tortfeasors. Gulf, C. & S. F. Co. v. Galveston, H. & S. A.
Co., 18 S.W. 956, 958-59 (Tex. 1892). On the other hand, it is commonly understood that
indemnity involves a shift in responsibility for payment of damages, Whitson v.
Goodbody's, Inc., 773 S.W.2d 381, 382-83 (Tex. App.--Dallas 1989, writ denied), whereby
one pays the entire amount due by another. Gulf, C. & S. F. Co. v. Galveston, H. & S. A.
Co., 18 S.W. at 958-59. We conclude, for several reasons, that indemnification (as the
term is commonly understood) rather than contribution was what was intended by the
parties to the subcontract.

 First, the words "indemnify, hold harmless, and defend," when read together, evince
an intent to completely shift the entire responsibility for payment to another. Nothing in the
paragraph qualifies their scope once the duty to indemnify, hold harmless and defend is
triggered. Second, according to paragraph 11.7, the duty arises when, among other
things, the injury contemplated is caused by KK, in whole and part, and "regardless of
whether it . . . [was] caused in part by a party indemnified hereunder." In other words, KK
is allegedly bound to reimburse LLC even for injuries LLC caused, as long as KK also
caused them in part. Simply put, there is no proration under these terms; instead, the
subcontractor is ultimately responsible for reimbursing LLC for everything. These indicia
compel us to hold that the obligation undertaken by KK was nothing short of pure
indemnification, as opposed to contribution or some mix of contribution and indemnity.

 So, because the subcontract says nothing about contribution and its terms evince
nothing of an intent to obligate KK to provide contribution, the only potential right of
contribution available to LLC would be that existent outside of the subcontract. 
Nonetheless, LLC remains without succor in that circumstance, given Varela, which
negates the availability of all forms of non-contractual contribution in cases like that at bar. 
See Dresser Indus., Inc. v. Lee, 880 S.W.2d 750, 752 (Tex. 1993) (reaffirming the
proposition that a third-party cannot seek contribution from a subscribing employer to
reduce the third-party's responsibility to the employee). Therefore, and as a matter of law,
LLC had no right of contribution to assert via its cross-claim against KK, and the trial court
did not err in entering summary judgment denying LLC recovery upon the claim.

 As to the matter of indemnity, we note the absence of any language expressing the
intent, through specific words, that KK would hold LLC harmless from injuries caused by
LLC's own negligence. This is required before same can occur. As said by the Supreme
Court in Ethyl Corporation v. Daniel Construction Company, "parties seeking to indemnify
the indemnitee from the consequences of its own negligence must express that intent in
specific terms." 725 S.W.2d 705, 708 (Tex. 1987); Enserch Corp. v. Parker, 794 S.W.2d
at 8 (reaffirming this principle, which is known as the express negligence rule). Because
paragraph 11.7 said nothing specifically about the negligence of LLC, the express
negligence rule was not satisfied. This, in turn, prevented LLC from obtaining indemnity
for injuries it caused in whole or part. (13) Thus, the trial court did not err in denying LLC
indemnification from KK for injuries arising from LLC's actions.

 Finally, we reject the suggestion of LLC that it was not attempting to recover
indemnity for the consequences of its own acts. The suggestion contradicts the
allegations in its cross-claim, where it averred that 1) "[s]hould . . . a jury find any
negligence, then Lee Lewis Construction is entitled to indemnity from KK Glass" and 2)
"KK Glass should be obligated to defend Lee Lewis Construction and to pay for any and
all damages awarded in this case." (emphasis added). In referring to "any" negligence
and "any and all damages," LLC clearly wanted KK to pay for everything. In wanting KK
to pay for everything, it could hardly be said under any rational interpretation of the
pleading that LLC wanted KK to reimburse it only for the damages caused solely by KK.

 In addition, since paragraph 11.7 fails to satisfy the express negligence rule, LLC
could not seek indemnification for injuries concurrently caused by LLC and KK. Such right
of recovery is known as comparative indemnity and must arise via contract satisfying the
express negligence rule. Enserch Corp. v. Parker, 794 S.W.2d at 8; Ethyl Corp. v. Daniel
Constr. Co., 725 S.W.2d at 707. This left LLC to recovering for injuries solely caused by
KK. Yet, matters of sole causation are not the stuff of cross-claims. Rather, they are
defensive issues invoked to prevent a plaintiff from recovering against the one asserting
that the injuries were solely caused by someone or something else. Indeed, if the injuries
at bar were solely caused by KK, then there would be no need for LLC to obtain indemnity,
for they could not have been charged against LLC.

 Accordingly, the summary judgment granted KK Glass is affirmed. Next, the court
suggests, under Texas Rule of Appellate Procedure 46.3, that the $500,000 award
recompensing Jimmy Harrison for pain, suffering and mental anguish be remitted by
$450,000. Should the sum not be remitted, the judgment (save for the summary judgment
granted KK Glass) will be reversed. Should remittitur be timely filed, the judgment will be
reformed and affirmed as reformed.


 Brian Quinn

 Justice



Publish. 
1. We say "retained" or "exercised" because the requisite control may be exemplified in either way. 
That is, it may be reserved by contract or merely exercised by the general contractor sans contract. Welch
v. McDougal, 876 S.W.2d 218, 222 (Tex. App.--Amarillo 1994, writ denied). If reserved by agreement, it
matters not whether the general contractor actually exercises it, for liability arises from the mere right to
exercise it. Campbell v. Adventist Health System / Sunbelt, Inc., 946 S.W.2d 617, 621 (Tex. App.--Fort
Worth 1997, no writ).
2. We note that while the standard of review applicable to claims of legal insufficiency obligates us
to focus upon the evidence favoring the jury's verdict, LLC focused on that which contradicted it. This did
not comport with its appellate burden. 
3. Incidentally, the superintendent himself agreed that his official duties included the "need to make
sure they [the subcontractors] do [their job] safely."
4. Question one read: "Did Lee Lewis Construction, Inc. retain the right to control safety on the
construction project where Jimmy Harrison suffered his fatal fall?" The jury answered "yes."

5. Because LLC's argument does not concern the foreseeability aspect of causation, we only address
the subject of cause in fact.
6. The other case cited by LLC, Texas Dept. of Corrections v. Jackson, 661 S.W.2d 154 (Tex. App.--Houston [1st Dist.] 1983, writ ref'd n.r.e.), is also distinguishable for the same reason Summers and Hopper
are. That is, what precipitated the original accident was of concern there, whereas our case involves the duty
to take particular action in the event an accident occurs.
7. Whether its probative value is outweighed by undue prejudice, see Tex. R. Evid. 403, is not before
us.
8. The trial court told the jury, via the charge, that evidence of subsequent remedial measures was
"not to be considered as proof of negligence, but only as evidence of control and for purposes of
impeachment."
9. While the factors we itemized are not exhaustive, we nevertheless reject the notion of Jimmy's kin
that the amount of money a reasonable person would take to voluntarily undergo the same incident is
pertinent. We do so because it is inherently specious. Simply put, a reasonable person would never opt to
fall to his death in exchange for money. 
10. Jimmy's kin were awarded exemplary damages of $5,000,000. In contesting that award, LLC
merely attacks the underlying finding of gross negligence. It does not argue that the amount awarded was
excessive. Thus, we need not analyze the validity of the sum itself pursuant to the edict of Ellis County State
Bank v. Keever, 915 S.W.2d 478 (Tex. 1995).
11. The provision states:


 To the fullest extent permitted by law, Subcontractor shall indemnify, hold harmless, and
defend Contractor . . . from and against all claims, damages, losses, and expenses . . .
arising out of or resulting from the performance of Subcontractor's Work . . . provided that 
any such claim, damage, loss, or expense (a) is attributable to bodily injury, sickness,
disease, or death . . . and (b) is caused in whole or in part by any negligent act or omission
of Subcontractor or anyone directly or indirectly employed by it or anyone for whose acts
it may be liable . . . regardless of whether it is caused in part by a party indemnified
hereunder.
12. The statute read: 


 If an action for damages on account of injury to or death of an employee of a subscriber is
brought . . . against a person other than the subscriber . . . and if such action results in a
judgment against such other person . . . the subscriber . . . shall have no liability to
reimburse or hold such other person harmless on such judgment . . . nor shall the subscriber
. . . have any tort or contract liability for damages to such other person because of such
judgment . . . in the absence of a written agreement expressly assuming such liability,
executed by the subscriber prior to such injury or death.
13. Though no case we have found clearly states it, we nevertheless interpret Ethyl and its progeny
as requiring the parties to actually include the word "negligence" or some synonym thereof in the
indemnification agreement before the express negligence rule is satisfied. We gather this from that portion
of Ethyl wherein the Supreme Court admonished parties to evince the pivotal intent through "specific terms." 
Ethyl Corp. v. Daniel Const. Co., 725 S.W.2d 705, 708 (Tex. 1987); see Houston Lighting & Power Co. v.
Atchison, Topeka & Santa Fe Ry. Co., 890 S.W.2d 455, 457-59 (Tex. 1994) (applying the express negligence
rule to indemnification for claims involving strict liability and holding that the rule was not satisfied because
the parties did not mention the intent to cover strict liability in "specific terms"). So too is this interpretation
of the rule the only way in which the holdings of such cases as Glendale Constr. Servs., Inc. v. Accurate Air
Sys., Inc., 902 S.W.2d 536 (Tex. App.--Houston [1st Dist.] 1995, writ denied), can be explained. In Glendale,
the parties contemplated indemnification even for injuries caused by the indemnitee. Yet, the word
"negligence" went unmentioned. One would think that obligating the indemnitor to reimburse the indemnitee
for injuries caused by the indemnitee would be sufficient indication of an intent to include the negligence of
the indemnitee. But, the court said no and we can only explain it by concluding that the word "negligence"
must be stated.